Case number 16-6714, Courtney Cates et al. v. Crystal Clear Technologies et al. Argument not to proceed, 15 minutes per side. Mr. Gastel, you may proceed with the appellate. May it please the court. My name is Ben Gastel. I'm a partner at the law firm of Brandcenter Strange and Jennings in Nashville, Tennessee, representing the plaintiffs here. I would like three minutes for rebuttal. That is fine, and you may proceed. We're here requesting that the court reverse a district court decision dismissing our complaint under a Rule 12b-6 motion for two reasons. We maintain that the district court improperly made factually findings at the Rule 12b-6 stage in finding that Crystal Clear is not an exclusive provider of telecommunications to the neighborhoods at issue in this litigation. And secondly, that the district court improperly dismissed plaintiff's antitrust time claims under Rule 12b-6. I think, obviously, to understand this case, to unlock this case, it's important to understand how we got here. And it's very clear, I hope, from the briefings and the complaint that this arrangement between Crystal Clear and the Homeowners Association here is the result of a self-dealing transaction. The developer of these neighborhoods created its own telecommunications company. And while the developer maintained control of the Homeowners Association, then entered into the communication services agreements that are now at issue before this court. So it's essentially the same players on both sides of this transaction. The CSAs, the communication service agreements, have clear anti-competitive terms, including what we often refer to as the mandatory take, meaning that homeowners in these neighborhoods have to buy service from Crystal Clear regardless of whether or not they use it. There's the exclusive easements, which raise significant concerns as to exclusivity. In other words, Crystal Clear has the exclusive easements that allow it to lay the telecommunications infrastructure necessary to provide telecommunications services within these neighborhoods. And the third key anti-competitive term is what I'll call the exclusive agency term, meaning that if anybody else, if Comcast or AT&T or any other big players, modern players in the telecommunications market, want to enter into these neighborhoods and provide service to the homeowners in these neighborhoods, they have to talk to Crystal Clear, possibly pay them a fee, and come into the neighborhoods on whatever terms Crystal Clear deems necessary and prudent. There's obviously other portions of the communication services agreement that we believe have anti-competitive effects, but those are the sort of three key ones. Plaintiffs allege that this makes Crystal Clear the de facto exclusive provider of telecommunications services in these neighborhoods. And this clearly violates the FCC's 2007 exclusivity order, which expressly excludes, and I'll quote, any provision in a contract that grants the exclusive right to provide any video programming services. Plaintiffs' appellate here submit that to allow the district court opinion to stand here would create a judicially sanctioned blueprint for how to evade this express prohibition that was created by the FCC in the 2007 exclusivity order. In other words, if the district court opinion here is allowed to stand, it guts the exclusivity order by showing how developers or any communications company can get exclusive arrangement by giving passive reference to other potential providers that can provide service in these communication services agreements. But then burdening them with such anti-competitive terms that would make it economically unfeasible for other providers to come in and offer service. And that's exactly what happened here. The district court, and we believe the key error in the district court's decision dismissing our case, is that the district court, contrary to the allegations in the complaint, rules that Crystal Clear is not the exclusive provider. It looks to the communication services agreements, looks at those terms that give passing and tacit reference to potential other providers potentially providing access. And essentially says that because the agreements say that other providers could potentially provide service, that we can't essentially allege a fact that's contrary to that term in the communication services agreement. This isn't a dispute really that we say that the agreement says X and the agreement really says Y, and possibly at the Rule 12B6 stage the district court could be permitted to sort of look at the contract and make a determination on that factual dispute. We readily acknowledge that the communication services agreement give this tacit reference to other potential providers. But the key here is that the practical implication of the communication services agreements is that they're the exclusive provider. And that I think is something that we should be permitted to prove through discovery, as opposed to the district court just accepting the terms of the communication services agreement is true and dismissing us at the Rule 12B6 stage. This court really needs to look no further than the Fourth Circuit decision in the Lansdowne case to see the error of the district court's reasoning. In that case, the Fourth Circuit was confronted with a nearly identical situation here where a homeowner's association had entered into a self-dealing transaction with their own created conglomerate of communication companies. And important, and I think key to the case here, is that the plaintiffs in that case won summary judgment, won a Rule 56 motion on identical claims under the 2007 exclusivity order. In a nearly factually identical situation where the homeowner's association entered into these communication services agreements that, again, implicitly provided the exclusive right for these communication service providers to provide service within the neighborhood. And the Fourth Circuit wouldn't even, the district court in that case ruled that it didn't even have to take the case to the jury, that there was no genuine issue of material fact that agreements of this kind violate the 2007 exclusivity order. So I struggle to believe that on this claim, which is count four of our operative complaint, a plaintiff can prevail at the Rule 56 motion in the Fourth Circuit but can't even get out of the gate in the Sixth. And so we certainly hang our hat and look to that Lansdowne decision from the Fourth Circuit upholding that grant of summary judgment in the plaintiff's favor for the reason why the district court simply got it wrong at the 12B6 stage. And your position is that Lansdowne is not different in any material way, obviously it's summary judgment versus 12B6, but otherwise Lansdowne is on all fours with your situation? I say that factually and legally the claims are nearly identical. Again, the Fourth Circuit in that case, if you read it, hangs a lot on the idea of the problem being the exclusive easements that sort of provide exclusive access to the communications infrastructure. Well, we have that here. We have similar exclusive easements. And again, this is not without proof. In our second amended complaint that we filed after the district court dismissed us, we attached a letter from the current homeowners association for one of the neighborhoods where the letter from the association, I should back up and say that the associations are now no longer under the same control as the people who run Crystal Clear. There's been a changeover of the control of the homeowners association. But in that letter, the new homeowners association says, So it's not like I don't have proof that this is an exclusive arrangement. There is. Now, the reason why that's not attached to my operative complaint is that the letter was written after the operative complaint was filed. So that's the first reason. I want to talk very briefly about our antitrust tying claims. Again, I don't think that there's any doubt that the arrangement is one of a tying arrangement. A tying arrangement is, quote, any agreement by a party to sell one product, but only on the condition that the buyer also purchase a different or tied product. So here, if you buy a lot in one of these neighborhoods, you, like I said, because of the mandatory take provision, have to purchase service from Crystal Clear whether or not you use it or not. So clearly a tying arrangement. The question becomes whether or not we have properly pledged that there's an antitrust violation, and specifically whether or not the geographic market that we allege is sufficient to pass Rule 12b6 muster. And then there's also a discussion about whether or not there's a substantial impact in the tied market, which are one of the key elements of a tying claim under the Sherman Act. We maintain that we certainly meet the necessary requirements of the tying market in our second amended complaint, which is, again, filed after the district court dismissed us without prejudice. And again, this case is a little bit different from the Michigan Monuments case, which the district court relies upon. In Michigan Monuments, the plaintiffs in that case were trying to create a market or allege a market that made each cemetery in Michigan its own market. And this court was concerned, I think rightfully so, that that was really collapsing the product market and the geographic market into a single analysis. And the panel in that case was uncomfortable with that idea. That's not what we're trying to do here, especially in our second amended complaint, which I think makes this clear, where we try to say that the market for lots and centrally planned communities in this town is the market, which I think takes us out of the Michigan Monuments problem that may or may not have existed with our first complaint. And then we can, I think, should be entitled to be able to prove through discovery that that's an adequate geographic and product market for purposes of maintaining a Sherman antitrust claim. What's the population of the town? Isn't it pretty small? It's a very small town, that's right, Your Honor. We have it in our second complaint. I want to say that it's a couple thousand people, yes. And we lay this out in the second amended complaint. It's a very unique town situated in this one county that's just south of Nashville that we think sort of makes it its own sort of distinct real estate market given its uniqueness. And we lay out those allegations. I see that I'm out of time. Okay. You will have your full rebuttal. Thank you. Thank you. Good morning. I'm Alex Varden. I'm speaking on behalf of the defendants other than the homeowners associations. Ms. Moore will speak on their behalf during part of our 15 minutes. This FCC exclusivity order is very specific in what it bars. It bars what are called building exclusivity clauses. These are clauses that give one provider the right to provide services while prohibiting any other provider, and I'm quoting now here from the FCC's order, prohibiting any other provider from any access whatsoever to the premises of an MDU building or a real estate development. Now these communication services agreements that are at issue in this case in the Tollgate and Bridgemore developments do not contain building exclusivity clauses. On the contrary, they expressly, specifically mandate that the homeowners in each of these subdivisions will be able to obtain the same television and Internet services from any provider that's willing to provide them. And the agreements don't stop there. They also provide that other providers other than Crystal Clear itself will have access to the neighborhoods to provide those services, and in fact will have access to and use of the same easement and fiber optic infrastructure that Crystal Clear uses itself to provide these services. And we know this from just looking at the agreement, which is what the district court did. In section 3.5 of each of these communication agreements, it says that the homeowner has the option in his or her sole discretion to obtain services from any and all alternate providers. And it goes on to say that any tenant or owner within these neighborhoods won't be denied access to services from any such provider, and that they can't be forced to pay any more for those services than that alternate provider generally charges for the services. You turn the page in the agreement and you get to Article 4, an entire article that's titled And that's the provision of these agreements wherein the alternate providers coming to the neighborhoods get the right, if they so choose, to have access to the easement and the same fiber optic network that Crystal Clear paid for, installed, and now maintains. So that's what these agreements contain, and they don't contain building exclusionary clauses. Quite the opposite. Do the agreements require these alternate providers to work with or negotiate with Crystal Clear or pay Crystal Clear some sort of a fee for seeking to either lay optics or infrastructure or otherwise provide services in the neighborhoods? The only instance in which they might have to pay a fee to Crystal Clear is if they themselves want access to the easement and the infrastructure that Crystal Clear has in the neighborhoods, which is going to be true in any kind of situation like this. We own the infrastructure, we paid for it, but what I think is really important here, if you want to look at what this agreement actually provides, and it's in this Article 4, if Crystal Clear and the alternate provider can't agree on what reasonable compensation is for use of that infrastructure, then the provider, the alternate provider, still gets to use it while that dispute's pending, and there's an expedited arbitration process described in the agreement by which an arbitrator then decides what that reasonable compensation is. So they have the right to use it. When you say to use the infrastructure, what all does that encompass? It includes, in Article 4 you'll see, the easement itself and then a fiber optic network that Crystal Clear installed that runs into this neighborhood and then runs the fiber optics to every single house within the neighborhoods. That's the infrastructure that I'm referring to. So the alternate provider runs the stuff into the home just exactly the same way Crystal Clear would, except that it's the alternate provider's video service, not whatever it is, what DirecTV I think is the one that Crystal Clear is contracting with. Yes. If the alternate provider provides programming over wire as opposed to satellite and they want to use the Crystal Clear fiber optic network to do that, then they have the right to do so as long as they provide reasonable compensation for the use of that network. So what is the impact on this claim of the fact that the homeowners all have to pay for the Crystal Clear provision of service, whether they're using it or not? It's an arrangement called a bulk billing arrangement that the FCC has separately examined and has entered a separate order on saying that it is, in general, it has pros and cons, but they say it is a permissible arrangement. And it is actually fairly common. And it's not any different from where a homeowners association, where you're required to pay your homeowners association a monthly fee for use of the clubhouse and pool in the planned community, whether you use them or not. Would the consumers, if they decided they wanted to use this alternate provider, would they have to pay an additional fee to the alternate provider and still keep on paying the fee that's going to Crystal? Yes. Whatever happens, every homeowner has to pay the same fee for the basic level of services provided by Crystal Clear. So wouldn't this mean that nobody would contract with an alternate provider then if they're going to have double the cost? If they want some kind of service that an alternate provider provides, super high speed Internet, some unique programming set, then they might. But again, Your Honor, the FCC, there is an FCC order that I cite in my brief that says that this very type of bulk billing arrangement, where you have to pay for the services, whether you use them or not, whether you have services from somebody else or not, is permitted. But I think my recollection of the briefs was that your opponent is disagreeing that this is, in fact, bulk billing. I understand that they – Well, that's a question that we would need to resolve. I think they're saying it's both bulk billing and exclusionary, and I'm saying it's the former and not the latter. And in fact, when Your Honors look at the Fourth Circuit case in Lansdowne that they rely on, there is a fundamental dispositive difference between that case and this case, and that is, in that case, the documents did state, and I'm quoting from the documents that issue in that case, and no other person may provide such services to the property. You'll look on page 194, page 191, page 196 of that Lansdowne decision, and you'll see that the reason the court ruled the way it did in that case is because the agreement did violate the exclusivity order, because it contained a clause that said no other provider may come into this development and provide these same services. Didn't – correct me if I'm wrong here – didn't Lansdowne, the documents there, also prevent anybody from amending the agreements in Lansdowne so that you could change the whole setup? I don't – I think that's an argument one of the defendants made about the possibility of an amendment, and the court said that wasn't enough. I don't know, Your Honor. What I do know is that those agreements contain the very type of clauses that the FCC's exclusivity order said were barred, and these agreements not only don't contain those clauses, but contained provisions, specific provisions, to the contrary. The unlawful tying claim, Your Honor, this is a claim in which the plaintiffs do this. They say that there are two planned communities in this one tiny town, Thompson Station, near Nashville, population 2,194, and that that constitutes the relevant geographic market for residential lots, which not incidentally then creates monopoly power in the developer of those two planned communities because that developer obviously is by definition the only seller, the only original seller of lots within the community. And having done that, the plaintiffs then declare that the developer used that power in violation of the Sherman Act to impose this bulk buying arrangement on buyers of lots in the community. And the district court correctly held that you cannot use that kind of circular reasoning where you do not even acknowledge anything that's going on in the world outside the confines of these two small planned communities in this tiny town and state a claim under federal antitrust law. The court specifically held that the plaintiffs had not alleged that requiring buyers of lots within just these two communities to participate in this bulk billing arrangement was affecting the market for telecommunication services outside the confines of the community substantially or let alone at all. And as you know from my brief, I think the court should have actually also ruled, as it did in dismissing the First Amendment complaint, that the plaintiffs had even failed to allege a plausible geographic market for residential lots in the first place because under this court's decision in Michigan Monuments and similar decisions of other circuits, would-be antitrust plaintiff cannot create or manufacture monopoly power by defining the market so that the market has by definition just one seller. So if you have a cemetery like you did in Michigan Monuments or you have a hospital like you did in the Jefferson Parish case, the Supreme Court case, or you have a building or you have a subdivision, these are not self-contained markets for antitrust purposes, at least not unless you have really unusual circumstances which are not even alleged here. Namely, those circumstances are circumstances that would demonstrate that there is no practical alternative source of substitute products anywhere within a reasonable geographic range. But the ultimate point is whether you focus on the tying product market like I just did or the tied product market like the district court ended up doing, you get to the same result for basically the same reason, which is that you cannot take two planned communities in a tiny town outside of Nashville, Tennessee, and come up with a Sherman Act violation by looking only what has happened in those two little tiny towns. And in fact, Your Honors, I'd submit that- Would you take like a whole big city like Cincinnati? Would that be a large enough geographic area? Depending on the circumstances, yes, it would. What you would have to do is make allegations, plausible allegations, that that is the reasonable geographic area in which consumers could seek alternative sources of whatever product that you're dealing with. So for example, they could have alleged here planned communities or residential lots within a 50-mile radius of Nashville or even planned communities in small towns within a 50-mile radius of Nashville. But what in fact is going on is that they're trying to define the market by the seller so that they automatically generate market or monopoly power and then can come up with a Sherman Act violation by only looking at what happens in the two planned communities themselves. And I submit, Your Honor, that if the plaintiffs were correct in this case in their antitrust claim, then any commonly funded amenity or service that a developer imposes on the homeowners of subdivision, for example, the fee that so many people have to pay to the association for the use of the clubhouse and pool, whether they use it or not, that that is a violation of the Sherman Act, that it's an antitrust violation when in fact those types of commonly funded services and amenities are commonplace. And the only fact that makes this particular bulk billing arrangement any different from many of those other situations is that according to the plaintiff, the provider of the television and Internet services here was an affiliate of the developer, which according to the plaintiff makes this an unconscionable and unfair self-dealing arrangement. But as the district court pointed out, these concepts, unconscionability, self-dealing, these are state court concepts that in the absence of federal claim need to be tested in state court. And for that reason, we believe that this court should affirm. Thank you, Mr. Fardon. Good morning, Your Honors. Valerie Dyden Moore for the appellees, the Homeowners Association, Bridgemore Village Owners Association, and Tollgate Village Association. Your Honor, we are also requesting that the district court's dismissal of this action be upheld in addition to the arguments raised by our co-appellees. We also offer an alternative reason not considered by the district court that the appellants lack standing to pursue these claims that belong to the property owners associations. There's no dispute here that the appellants have not sought to meet the standards to bring a derivative action under Tennessee law. The only question here is whether these claims are direct to the appellants or are derivative to the associations. Under the Thule standard, which is the Delaware standard adopted by the Tennessee Supreme Court in Keller, the questions are two. One, who suffered the harm? And second, who would receive the benefit of any recovery or any other remedy? With respect to the first question, who suffered the harm, we look to the nature of the wrong. As this court held in McCarthy, claims for actions contrary to the best interests of the corporation and in violation of the purposes for which the corporation was formed must generally be brought as derivative actions. Here we've heard multiple times the appellants refer to these as self-dealing claims, that the POAs were controlled by the developers and entered into self-dealing transactions by entering into these communication services agreements. Viewing the appellants' allegations in the best possible light, these are injuries that belong to both the POAs and the appellants. Well, if they belong to both of them, why can't the appellants sue for their own harm? Because it is a direct injury that is not independent of any alleged injury to the POA. So it is still a derivative injury, not a direct injury. And that's from the Tooley case, and I believe it's also stated in the Keller case. And under the second prong of the Tooley standard, who would receive the benefit of any recovery or other remedy, here the alleged direct claims would have required the plaintiffs to have suffered some individualized harm not suffered by all of the property owners. And here the alleged action is an alleged class action where everyone suffers the same injury and everyone would receive the same benefit, namely the ability to not pay the assessment to Crystal Clear. And for these reasons and for those articulated by our co-appellees, we request that the court affirm the judgment of the district court. Are there any cases that have held that this type of a thing is only a derivative and not a direct injury? I'm not aware of any that have held that specifically. I think that you can contrast this with some cases from other courts, other state courts that indicate there must be some sort of privity of contract or injury to the shareholder's or a member's voting interests, for example, or some sort of violation of the bylaws. There are a couple of cases, one from the Wisconsin Court of Appeals, Ewer v. Lake Arrowhead Association, Inc., where the Court of Appeals found that some property owners had alleged direct claims because they alleged the bylaws were being applied in the wrong way in making assessments. And it was a specific subset of landowners in that community and not the entirety of the community. Thank you. Thank you, Ms. Moore. Mr. Castell? Thank you. I just want to obviously address a couple of quick things on the exclusivity portion of the program today. You heard Crystal Clear's counsel claim that the provisions here don't have that exclusivity, or the communication services agreements at issue here don't have that exclusivity language that was admittedly important in the Lansdowne case. I actually factually disagree. Each of the communication services agreements at issue in this case contain the following provision, and I'll quote it. Association has chosen Crystal Clear Technologies to operate and maintain the system and to provide basic services to each home in Tollgate Village, the provision for Bridgemore is identical, on an, quote, important exclusive basis consistent with the terms of this agreement and applicable law. So there is an exclusive provision in the current CSAs, so I don't think that you can differentiate Lansdowne from this case by simply saying, well, Lansdowne had the express claim of exclusion and this case doesn't. This case has the express exclusive right to serve that was at issue in Lansdowne. It just has this additional tacit acknowledgment that Crystal Clear, on its terms, and if you pay us a fee, another provider can come in. The practical implication of that, and again, I would encourage you to read the current homeowners association's letter that I quoted earlier that's in the record. Other providers aren't going to come in and serve these neighborhoods on the terms that are laid out in the communication services agreement. So allowing the CSAs to stand here, again, would functionally gut the exclusivity order by just providing the blueprint for how you get an exclusive arrangement without violating the 2007 exclusivity order. The purpose of the 2007 exclusivity order is to encourage competition between providers within the telecommunications market and specifically the residential market. The CSAs here are very clearly anti-competitive, contrary to the letter in the spirit of the 2007 exclusivity order. And we think that the district court, at the outset, without letting us prove the exclusive nature of this, by just dismissing us right out of the gate, is not proper under Rule 12b-6. This is a factual dispute that we should be entitled to take discovery on and prove it. Now, if it comes back at the Rule 56 stage that I'm wrong and it's not an exclusive arrangement, then they may be entitled to summary judgment. I think the facts are going to shake out otherwise. And I think the facts, after I get them in discovery, are going to show, in fact, that the providers aren't going to come into these neighborhoods with these communication services agreements in place. And they're for 25- and 50-year terms. I'm out of time. Okay. Thank you, Mr. Gaschel. Thank you, counsel, three of you for your arguments this morning. We very much appreciate them. The case will be submitted and you may call the next case.